UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIM.NO.: 1:12cr78-01, 02, 04 (BAH) |
| | ) |
| ANGEL JAVIER VARON CASTRO, | ) |
| | ) |
| LUIS DELIO HERRERA ASTUDILLO, | ) |
| | ) |
| EUSEBIO DAVID WEBSTER ARCHBOLD, | ) |
| | ) |
| Defendants. | ) |

**GOVERNMENT'S MOTION FOR A PRE-TRIAL
DETERMINATION OF JURISDICTION BY THE COURT**

COMES NOW the United States of America, by and through its undersigned counsel, and pursuant to the Minute Order entered May 2, 2014, respectfully files this motion requesting that the Court make a pre-trial determination of jurisdiction pursuant to 46 U.S.C. § 70504 of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70501 *et seq*. Specifically, the Government submits that it has satisfied its burden of proof that the vessels seized in the above-captioned matter were "vessels subject to the jurisdiction of the United States," within the meaning of 46 U.S.C. § 70502(c)(1), as a result of the vessels being deemed "vessels without nationality," pursuant to 46 U.S.C. § 70502(c)(1)(A) and the MDLEA's incorporation of international law principles relating to "stateless" vessels. In support of this motion, the Government states as follows:

**I.   FACTUAL AND PROCEDURAL HISTORY**

On August 17, 2012, a federal grand jury sitting in the District of Columbia returned a three-count Second Superseding Indictment charging the Defendants with conspiring to distribute and possess with intent to distribute, and distributing and possessing with intent to

distribute, five kilograms or more of cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a) and 70506(b), and 18 U.S.C. § 2. The Indictment was the product of an approximately three-year international investigation conducted by the United States Drug Enforcement Administration ("DEA") and foreign law enforcement agencies in Colombia which revealed that the Defendants and others were engaged in cocaine smuggling activities as part of a maritime drug trafficking organization ("DTO"). The investigation resulted in, *inter alia*, the attempted and successful interdiction of two cocaine-laden, stateless Go-Fast Vessels ("GFVs") in the Caribbean Sea by U.S. and Colombian authorities on February 22, 2010 (GFV Rilax) and April 12, 2010 (GFV Antonella), respectively. The cocaine was being transported from the northern coast of Colombia, primarily out of the Cartagena area, to destination countries bordering the western Caribbean Sea.

### GFV Rilax Attempted Interdiction – February 22, 2010

On or about February 22, 2010, at approximately 11:00 a.m. local time, U.S. Coast Guard personnel aboard the USS FREEDOM were alerted by a Maritime Patrol Aircraft to the presence of an unidentified GFV with no visible indications of nationality riding low in the water and operating at a high rate of speed of 30 knots on the high seas, approximately 55 nautical miles southeast of San Andres Island, Colombia.[1] The vessel was described as approximately 40-feet in length with a white hull and numerous fuel barrels on board, but no other initially noticeable markings. The vessel also had two outboard motors and a blue tarp covering the bow. Four people were observed on board. After detecting the maritime enforcement assets, the crew of the

---

[1] The San Andres Archipelago includes the Colombian-owned islands of San Andres, Providencia and Santa Catalina. The islands are located in the Caribbean Sea, approximately 482 miles northwest of Colombia and 140 miles from the coast of Nicaragua. *See* http://en.wikipedia.org/wiki/Archipelago_of_San_Andr%C3%A9s,_Providencia_and_Santa_Cat alina (last checked June 13, 2014).

GFV Rilax increased the vessel's speed in an attempt to avoid interdiction, jettisoning suspected contraband in the process.  Attempts by the U.S. Coast Guard to hail the GFV in English and Spanish to stop were met with negative results.  Instead, the crew continued to jettison its cargo from underneath the blue tarp and increased the vessel's speed to 40 knots.  The U.S. Coast Guard received authorization from its District Headquarters to conduct a Right of Visit boarding and to use warning shots to compel compliance if necessary.  After an additional attempt to signal the vessel to stop failed, the Designated Marksman fired two separate volleys of warning shots in front of the GFV, the first with three stitches (consisting of 15 rounds per stitch) and the second with one stitch.  After the warning shots were conducted, at least three of the crew members moved to the front of the GFV, likely in anticipation of the use of authorized disabling fire on the engines (which ultimately was not used) and suggesting the crew members' familiarity with U.S. Coast Guard interdiction tactics.  The warning shots had no impact as the GFV continued to travel at 40 knots while the crew continued to throw suspected contraband into the water.  As the pursuit continued, Colombian authorities dispatched two boats to aid in the interception of the GFV.  The vessel's name, "Rilax," and registration number "MT-03-80-653" were later determined to be painted on both the port and starboard sides of the boat, visible later only after the blue tarp fell away during pursuit.  The U.S. Coast Guard air asset continued with the pursuit until it was within one nautical mile of, and the vessel was nearly at, Colombia's territorial waters.  The Colombian Navy later discovered the GFV beached on Santa Catalina, a Colombian-owned island connected by a bridge to Providencia Island, another Colombian-owned island in the San Andres Archipelago.  The crew had fled from the beached vessel, escaping on foot into Providencia.  Colombian judicialized wiretap calls during the pursuit confirmed that Defendant Webster Archbold, a boat captain, was on board the GFV Rilax during

the pursuit (these recordings have been disclosed to the defense in discovery).  The U.S. Coast

Guard searched the debris field for the jettisoned cargo, recovering 7 bales and 72 individual,

loose kilogram packages, or approximately 279 kilograms of cocaine.  Later Narcotics

Identification Kit (NIK) tests performed by the U.S. Coast Guard, and DEA laboratory testing,

returned positive for the presence of cocaine.  Colombian authorities also aided in the contraband

search, recovering an additional approximately 140 kilograms of cocaine from the water, and

another additional kilogram from the beached boat itself.  Approximately 80 gallons of fuel was

also recovered from the boat.  Moreover, although the Colombian authorities conducted a later

search of the vessel and found documents and a navigation chart with graphics and coordinates

hidden in a fuel drum on board the vessel, those documents were not further identified, to the

Government's knowledge, in the materials it received informally from the Colombian

Government.[2]

### GFV Antonella Interdiction – April 12, 2010

On or about April 12, 2010, U.S. Coast Guard personnel aboard the U.S. Coast Guard

Cutter VALIANT were alerted by a Maritime Patrol Aircraft to the presence of a GFV operating

low in the water at a rate of speed of 22 knots on the high seas, over 100 nautical miles southeast

from San Andres Island, Colombia, the nearest point of land.  The vessel was described as

approximately 35 to 40-feet in length with a blue hull, a tarp covering the deck, and two

outboard engines.  The U.S. Coast Guard's boarding team, which was dispatched on a rigid-

hulled inflatable boat (RHIB) to intercept the vessel, observed fuel drums and suspected

contraband being thrown by the crew members, as well as erratic speeds and course changes, as

---

[2]     This information was obtained from the Case Law Enforcement Packets prepared by the
U.S. Coast Guard following the attempted interdiction, as well as from other discovery materials
disclosed to the Defendants.  Photographs of the beached vessel showing its name and number
were also disclosed to the Defendants.

the pursuit was underway.  The vessel then slowed to approximately 3-5 knots before becoming

dead in the water as the U.S. Coast Guard RHIB came alongside.  The vessel was not flying a

flag, but had the name "Antonella" and number "MT-03-80-670" painted on its side.  There was

no identifiable homeport or other indicia of nationality on the vessel.  The boarding team

received permission to board the vessel to disable its fuel system and remove the ignition keys to

prevent the crew's flight.  The four individuals on board claimed they were Colombian nationals;

the master, Fermin Alberto Garcia, also claimed the vessel was of Colombian nationality.[3]  As a

result of this claim, and pursuant to the United States' maritime drug trafficking bilateral

agreement with Colombia, the U.S. Coast Guard contacted the relevant Colombian authorities

pursuant to the agreement's standard operating procedures to verify the vessel's flag status.  In

that request, the U.S. Coast Guard mistakenly identified the vessel as the "Antonela" with

registration number "MT-0380-671."  The Colombian Government, through a faxed response

signed by the Director of the Center for Naval Operations, verified the flag status and authorized

the boarding, inspection, and detention of the vessel, the crew, and its cargo, with a directive that

if narcotics were found on board, the vessel, crew, and drug evidence would also be turned over

to the Colombian Government.  During its search of the vessel and crew, the boarding team

found a Garmin GPS, laminated charts of the Caribbean Sea, and several cellular and satellite

phones.  No other registration documents were found.  Approximately twenty-two large fuel

drums were also on the vessel although many of the barrels were already empty.  Seven tightly

---

[3]      When asked by the boarding team what they threw overboard, Garcia responded, "They
think it was cocaine."  The master also admitted that they had departed from a location north of
Cartagena the day before and were to deliver the bales to San Andres.  In 2004, years before his
involvement in the GFV Antonella transport, Garcia was convicted in the U.S. District Court for
the Middle District of Florida on maritime smuggling charges and sentenced initially to 168
months imprisonment, before having his sentence reduced to 70 months due to cooperation.  *See*
*United States v. Fermin Alberto Garcia*, Criminal Case No. 8:03cr458 (JSM).

wrapped large bales were observed on deck in the middle of the vessel and seized; one of the bales field-tested positive for cocaine.  The crew, the vessel, and the seven bales of cocaine (about 191 kilograms) were turned over to Colombian authorities.  The U.S. Coast Guard retrieved an additional two bales of cocaine from the water, containing 60 "bricks" of cocaine or approximately 68 kilograms of cocaine total.  This cocaine also tested positive during field and DEA laboratory testing.[4]

Colombian judicially-authorized intercepted telephone conversations and other evidence support that during the period of the charged conspiracy, Defendant Herrera-Astudillo served as a head of the DTO and was responsible for obtaining the cocaine from his source of supply and investing in and financing both the GFV Rilax and GFV Antonella transports.  Defendant Varon-Castro was responsible for coordinating the logistics and details regarding the narcotics transports, to include the movement of the cocaine over land from the interior of Colombia to the northern Colombian coastline and then the transport of the cocaine via GFVs.  Defendant Webster-Archbold was, among other duties, a boat captain responsible for logistical support for the vessels and was on board the GFV Rilax during its failed transport.[5]

Following their provisional arrests in Colombia, Defendants Webster Archbold, Herrera Astudillo, and Varon Castro were extradited to the United States between June and August 2013 to face prosecution.  Since their arrival, pre-trial status conferences have been periodically held.

---

[4]     This information was obtained from the Case Law Enforcement Packets prepared by the U.S. Coast Guard following the successful interdiction, as well as from other discovery materials disclosed to the defense.  Photographs of the seized vessel showing its name and number were also disclosed to the Defendants.

[5]     The United States' extradition request for a fourth Defendant, Gabriel Martinez-Pacheco, was withdrawn despite that individual being approved for extradition by the Colombian Government.  The Colombian authorities had limited the United States' prosecution as a result of Martinez-Pacheco's guilty plea and 11-year sentence in Colombia on conduct relating to the DTO's activities.  Two of the indicted conspirators remain fugitives.

At the last hearing conducted May 2, 2014, the Government informed the Court that its ongoing efforts to gather evidence from the U.S. Coast Guard and the foreign authorities resulted in the Government's receipt of materials relating to the registration or nationality of the GFV Rilax and GFV Antonella that were arguably inconsistent with materials previously provided (and disclosed) to the Defendants. *See* Docket Entry 46 (Government's Status Report in Advance of the May 2, 2014 Status Conference, filed May 1, 2014). Further, the Government informed the Court that these materials conceivably supported that the GFV Rilax and GFV Antonella may have been Colombian-registered at the time of their interdictions despite the Government's good faith basis at the time of the original Indictment supporting that the vessels were stateless and thus "vessels without nationality" under § 70502(c)(1)(A). As a result of this information, the Government sought additional time to investigate what impact, if any, this information would have on the Government's jurisdictional arguments. The Government also sought a briefing schedule for the filing of motions related to MDLEA jurisdiction, resulting in the instant motion. Should this case proceed to trial, in addition to the maritime seizures, the Government intends to rely on, among other items, evidence of the DTO's land-based drug transports, Colombian-judicialized wiretaps, surveillance, and travel and banking records to prove the conspiracy and substantive counts.

## II.   ANALYSIS

### A.   The MDLEA and "Vessel Without Nationality" Concept

Under the Maritime Drug Law Enforcement Act ("MDLEA"):

An individual may not knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board -- (1) a vessel of the United States or a vessel subject to the jurisdiction of the United States; or (2) any vessel if the individual is a citizen of the United States or a resident alien of the United States.

46 U.S.C. § 70503(a).  Moreover, "[s]ubsection (a) applies even though the act is committed outside the territorial jurisdiction of the United States."  46 U.S.C. § 70503(b).  It is also unlawful to attempt to violate or to conspire to violate § 70503.  *See* 46 U.S.C. § 70506(b).

The MDLEA defines a vessel "subject to the jurisdiction of the United States" to include "a vessel without nationality."  46 U.S.C. § 70502(c)(1)(A).  The statute provides that a "vessel without nationality," commonly called a "stateless" vessel:

> includes --
>
> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
>
> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1).  The use of the word "includes" establishes that this list is not exhaustive.  *See, e.g., United States v. Rosero*, 42 F.3d 166, 170 (3d Cir. 1994) (interpreting predecessor MDLEA statute and finding that 46 U.S.C. app. §1903(c)(2) "does not attempt to provide an exhaustive definition of the term 'vessel without nationality'"); *see also United States v. Matos-Luchi*, 627 F.3d 1, 4 (1st Cir. 2010) (finding that the "listed examples do not exhaust the scope of section 70502(d)"); *United States v. Acosta Valdez*, 84 F. Supp. 2d 237, 238 (D. P.R. 1999) (vessels without nationality list under § 1903(c)(2) is not exhaustive).[6]  Instead,

---

[6]      In contrast, a "claim of nationality or registry" under 46 U.S.C. § 70502(e) "**includes only**" possession and production of documents pursuant to the 1958 Convention on the High Seas; flying a nation's ensign or flag; or a verbal claim of nationality or registry by the master. 46 U.S.C. § 70502(e) (emphasis added).  Both *Rosero* and *Matos-Luchi* found that by using the open-ended description "includes," under § 1903(c)(2), and its successor, § 70502(d)(1), respectively, Congress intended the list of vessels without nationality to be non-exhaustive.  As

relevant precedent firmly establishes that the term "vessel without nationality" under the

MDLEA also incorporates the concept of a "stateless vessel" as understood by traditional

concepts of international law.  *See, e.g., Rosero*, 42 F.3d at 171 (finding that "vessel without

nationality" concept had "reasonably well developed meaning under international law," and

where Congress uses words that have settled meaning in equity or common law, then court

should infer, absent contrary evidence in the statute, that Congress meant to incorporate the

established meaning of terms); *Matos-Luchi*, 627 F.3d at 4 ("At the very least, Congress intended

to include in section 70502(d), in addition to the specific examples given, those vessels that

could be considered stateless under customary international law"); *United States v. Carvajal, et*

*al.*, 924 F. Supp. 2d 219, 235 (D.D.C. 2013) (finding that "MDLEA's list of what constitutes a

'vessel without nationality' is not exhaustive" and "also encompasses vessels considered

'stateless' or 'without nationality' under international law").

The international law principles surrounding the nationality of ships are firmly

established in a number of conventions, to include the 1958 Convention on the High Seas[7] which

provides at Article 5:

---

then-Circuit Judge Alito noted in *Rosero*, Congress' choice of words and the contrast between
"includes" (to describe vessels without nationality) and "includes only" (to describe a claim of
nationality or registry):

> dispels any suggestion that the statutory drafters sloppily used the term "includes" [in the
> stateless vessel section] when they meant to say "only includes."  Consequently, it seems
> clear from the statutory language that the term "vessel without nationality" encompasses,
> not only those vessels that come within the categories described . . ., but other vessels as
> well.

*Rosero*, 42 F.3d at 170.

[7]     Both the United States and Colombia have signed the Convention on the High Seas.  The
United States ratified it on April 12, 1961.  Colombia has not ratified it.  *See* "Convention on the
High Seas:  Status as at 06 December 2014," located at

> 1. Each State shall fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag.  Ships have the nationality of the State whose flag they are entitled to fly.  There must exist a genuine link between the State and the ship; in particular, the State must effectively exercise its jurisdiction and control in administrative, technical and social matters over ships flying its flag.
>
> 2. Each State shall issue to ships to which it has granted the right to fly its flag documents to that effect.

U.N. Convention on the High Seas art. 5, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 397.  The

1982 United Nations Convention on the Law of the Sea ("UNCLOS")[8] has a nearly identical

provision at Article 91 ("Nationality of Ships"):

> 1. Every State shall fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag. Ships have the nationality of the State whose flag they are entitled to fly. There must exist a genuine link between the State and the ship.
>
> 2. Every State shall issue to ships to which it has granted the right to fly its flag documents to that effect.

UNCLOS art. 91, Dec. 10, 1982, 1833 U.N.T.S. 561.  *See also* UNCLOS, art. 94 ("Duties of the

flag state – 1.  Every State shall effectively exercise its jurisdiction and control in administrative,

technical and social matters over ships flying its flag.  2.  In particular every State shall: …. (b)

---

https://treaties.un.org/doc/Publication/MTDSG/Volume%20II/Chapter%20XXI/XXI-2.en.pdf (last checked June 12, 2014).

[8]     The United States has neither signed nor ratified the UNCLOS although it regards much of it as reflecting customary international law.  *See, e.g., United States v. Ali*, 885 F. Supp. 2d 17, 29 (D.D.C. 2012) (noting the United States "'has recognized that [the UNCLOS's] baseline provisions reflect customary international law'") (citing *United States v. Dire*, 680 F.3d 446, 459 (4th Cir. 2012) (quoting *United States v. Alaska,* 503 U.S. 569, 588 n.10 (1992))); *United States v. Hasan*, 747 F. Supp. 2d 599, 619 (E.D. Va. 2010) (noting that despite that the United States has not ratified the UNCLOS, "[n]evertheless, the United States has accepted as customary international law the treaty provisions dealing with 'traditional uses' of the sea").  Colombia also has not ratified the UNCLOS (although it did sign it on December 10, 1982).  *See* "Table recapitulating the status of the Convention and of the related Agreements, as at 10 January 2014," located at http://www.un.org/Depts/los/reference_files/status2010.pdf (last checked June 10, 2014).

assume jurisdiction under its internal law over each ship flying its flag and its master, officers and crew in respect to administrative, technical and social matters concerning the ship.").

In addition, the Restatement (Third) of Foreign Relations Law (1987) states at § 501:  "A ship has the nationality of the state that registered it and authorized it to fly the state's flag, but a state may properly register a ship and authorize it to fly the state's flag only if there is a genuine link between the state and the ship."  Restatement (Third) of Foreign Relations Law § 501 (1987); *see also id.* cmt. c ("Registration and right to navigate.  A ship may not navigate without being registered in, and flying the flag of, some state….A ship that is not registered in any state and is not entitled to fly the flag of any state is considered "a ship without nationality."); *Matos-Luchi*, 627 F.3d at 5 (stating that vessels that fly no flag are "stateless" under international law because "[u]nder international law, every vessel must sail under the flag of one and only one state; those that sail under no flag or more than one flag enjoy no legal protection") (citing 1 L. Oppenheim, *International Law*, § 261, at 595-96 (H. Lauterpacht ed., 8th ed 1955) and Convention on the High Seas, art. 6, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82).  These international law principles are also well-recognized in maritime cases.  In *Lauritzen v. Larsen*, the Supreme Court stated that "each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it" and that "the United States has firmly and successfully maintained that the regularity and validity of a registration can be questioned only by the registering state."  345 U.S. 571, 584 (1953) (finding the United States had no jurisdiction over Danish sailor aboard Denmark-flagged vessel).

B.      **MDLEA Jurisdiction**

Under the MDLEA, "[j]urisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense.  Jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge."  46 U.S.C. § 70504(a). *See also United States v. Angulo-Hernandez*, 565 F.3d 2, 11 (1st Cir. 2009) ("Jurisdiction under the MDLEA is not an element of the offense; it is a 'preliminary question[] of law to be determined solely by the trial judge.'"); *United States v. Vilches-Navarrete*, 523 F.3d 1, 19-20 (1st Cir. 2008) (finding that jurisdictional issue "is not an element of the crime in the requisite sense and may be decided by a judge"); *United States v. Tinoco*, 304 F.3d 1088, 1107-10 (11th Cir. 2002) (upholding constitutionality of court, rather than jury, determining jurisdiction under MDLEA); *United States v. Estupinan*, 453 F.3d 1336 (11th Cir. 2006) (per curiam) (same); *Carvajal*, 924 F. Supp. 2d at 229 (same); *United States v. Anturi-Larrahondo*, 885 F. Supp. 2d 209, 224 (D.D.C. 2012) (same).

Further, the Government bears the burden for establishing statutory jurisdiction under the MDLEA.  *Tinoco*, 304 F.3d at 1114.  Although the Government has not identified any D.C. Circuit cases setting forth the burden of proof for establishing MDLEA jurisdiction, the preponderance of the evidence standard has been imposed by the First Circuit and a district court of this district.[9]  *See, e.g.*, *Matos-Luchi*, 627 F.3d at 5 ("In our view, Congress intended it to be a

---

[9]      There are two appeals currently pending in the D.C. Circuit relating to the MDLEA.  The first appeal in *United States v. Munoz-Miranda, et al.*, consolidated case numbers 13-3032 and 13-3036, is by the Defendants in the *Carvajal* case cited herein (*see* DDC Case No. 1:10cr106, J. Collyer).  That case is set for oral argument on September 15, 2014.  However, the Defendants there did not challenge whether a preponderance of the evidence standard is the correct one when assessing jurisdiction.  The second case, *United States v. Juan Ballestas*, D.C. Cir. Case No. 13-3107, remains in the briefing stage but it is also not anticipated, based on the underlying motions practice, that that Defendant will be challenging the preponderance of evidence standard on appeal.

preliminary issue, like venue or other judge-determined issues, to be proven by a preponderance

of the evidence standard."); *United States v. Mitchell-Hunter*, 663 F.3d 45, 50 (1st Cir. 2011)

(same); *Carvajal*, 924 F. Supp. 2d at 229 (same).  The Government submits, for the reasons

stated below, that it has proven MDLEA jurisdiction over each of the relevant GFVs by a

preponderance of the evidence.

**C.**     **The GFV Rilax Seized February 22, 2010 Was a "Vessel Without Nationality"**

The GFV Rilax, seized on or about February 22, 2010, after beaching on the Colombian

island of Santa Catalina following an attempted interdiction by the U.S. Coast Guard, was

"stateless" or a "vessel without nationality" under the MDLEA's incorporation of international

law.

The U.S. and Colombian authorities' investigation determined that upon observance and

ultimate interdiction of the GFV, the name "Rilax" and the number "MT-03-80-653" was on the

side of the vessel, but there were no other markings on the vessel, to include any homeport, nor

was it flying a flag.  Moreover, as noted above, although the Colombian authorities found

documents and a navigation chart with graphics and coordinates hidden in a fuel drum on board

the vessel, the nature of those documents were not further specified.  Additionally, since the crew

members fled from the pursuing maritime authorities, jettisoning cocaine along the way before

ultimately beaching the vessel on the shores of Colombia's Santa Catalina Island and then

fleeing on foot over a connecting bridge to nearby Providencia Island (Colombia), none of the

crew members made a claim that the vessel was registered to or flagged with a particular

country, identified the vessel's owner, or presented any form of paperwork documenting

ownership or registration with the Colombian government.  *See* 46 U.S.C. § 70502(e).  Notably,

calls intercepted pursuant to a Colombian judicialized wiretap support that Defendant Webster-

Archbold was one of the crew members on the GFV Rilax who managed to flee and avoid law enforcement authorities.

Prior to indictment, the Government sought verification from the Colombian authorities whether the GFV Rilax was listed in its vessel registry with the Colombian Ministry of National Defense's General Maritime Division, commonly known as the "DIMAR." The DIMAR is responsible for regulating and registering Colombian seagoing vessels. The Government received a letter from a Navy Captain with DIMAR's Port of Cartagena Headquarters, dated March 5, 2012, stating that as relating to the "motorboats 'Rilax' and 'Antonela'" "there is no information about these boats in the General Maritime Division database." *See* Exhibit A (in Spanish, with English translation). More recently, the Government again requested verification from the Colombian authorities of whether the GFV Rilax was registered or flagged at the time of interdiction according to DIMAR's maritime records. In response, the Government received a letter from DIMAR's Port of Cartagena Headquarters, dated May 16, 2014, once again stating that in response to a request for a database search, the "motorboats of the name RINA [*sic*] Reg. MT-03-80-653, and ANTONELA [*sic*] Reg. MT-03-80-670, are not registered with the Maritime Headquarters, as evidenced in the attached screenshots," said screenshots showing no database hits for the "RILAX" and "ANTONELA." *See* Exhibit B at 1-3 (in Spanish, with English translation). In addition, the letter states that "according to the provided registration numbers, these correspond to the Transportation Ministry inland waterways registry." *See* Exhibit B at 1.

As noted at the May 2, 2014 status hearing, the Government's on-going investigation revealed that the GFV Rilax, with number MT-03-80-653, was registered with Colombia's Ministry of Transportation's Transportation and Transit Division / Inland Waterways Inspection office at the written request of its represented owner, Jose Antonio Varon Gonzalez, on or about

14

February 11, 2010, only eleven days before the GFV Rilax's seizure.  *See* Exhibit C at 1, 2 (in

Spanish, with English translation).  However, the scope of that registration was specifically

limited on the permit itself to travels within various inland waterways, specifically Cartagena

rivers, canals and bays; similarly, the Small Craft Technical Inspection Certificate also states:

"Present document is issued for navigating on the river: Magdalena, tributaries, Canal del Dique,

and Cartagena Bay."  *See* Exhibit C at 2-3 (in Spanish, with English translation).

To further ascertain whether the Colombian Government "affirmatively and

unequivocally" intended to "assert that the [vessels at issue in this case are] of its nationality" (46

U.S.C. § 70502(d)(1)(C)), the United States requested that the Colombian Ministry of

Transportation ("MOT") formally convey the Colombian Government's position on this

matter.[10]  Specifically, the MOT was asked whether the registrations at issue here were intended

by the Colombian Government to convey Colombian nationality or registry *everywhere*,

including maritime waters, or whether the Colombian Government intended for these

registrations to have the territorial limit articulated in the registrations themselves.

In a letter issued June 12, 2014, the MOT, on behalf of the Colombian Government

answered this question unequivocally.  First, the MOT reiterated its exclusive role as the

Colombian Central Authority over this question:  "the registration of inland vessels is the

responsibility of the Ministry of Transportation, which issues a registration and an inland

waterway navigation permit …."  *See* Exhibit D (in Spanish, with English translation).  It also

explained, "in the Colombian legal system there are two types of registrations, one for maritime

vessels, the governing authority for which is the DIMAR, and one for inland vessels,

---

[10]     The United States was referred to the Ministry of Transportation as the Central Authority
for the Colombian Government on the matter of the scope and reach of its registration.

responsibility for which is assigned to the Ministry of Transportation." *See* Exhibit D.  In

response to the question at issue here, the MOT reaffirmed that their "inland waters"

registrations have territorial and use limitations, and thus were not intended to convey

Colombian nationality or registry in maritime waters:  "[the] Colombian Code of Commerce

indicates a prohibition for inland vessels … [that] [i]nland vessels *may not be used for maritime*

*navigation.*"  *See* Exhibit D (emphasis added).  This is the only definitive statement from the

Colombian Central Authority on this matter.[11]

The Colombian Government's representation that the referenced vessels' registration had

no effect outside its inland waters, in other words, that it was a vessel without nationality for

purposes of the MDLEA, is controlling.  As noted above, both the Convention on the High Seas

and the United Nations Convention on the Law of the Sea make clear that a foreign country has

the authority to fix the conditions of its vessel registries or to determine which vessels are

entitled to fly its flag.  Through the DIMAR checks (which confirmed that the vessels were never

registered in the proper Colombian maritime registry), and the representations in the June 12,

2014 letter, it is clear that the Government of Colombia has not invoked that the vessels in

question are of its "nationality" as that term is understood under the MDLEA and in international

law.  *See* 46 U.S.C. § 70502(d)(1)(C).  Accordingly, the vessels are properly deemed "vessels

without nationality."  *See, e.g., Matos-Luchi*, 627 F.3d at 7 ("The statute's provisions dovetail: a

---

[11]     The Government notes that, after an informal inquiry through law enforcement channels, it initially received a May 16, 2014 letter from a Colombian Navy Captain in Cartagena expressing the view that a vessel registered with the Ministry of Transportation is "considered Colombian flagged, and subject to the corresponding international accords to which Colombia is a party."  It is clear today, however, that this Navy Captain, who has no affiliation to the Ministry of Transportation, was not the individual to address the scope and nature of the MOT registrations at issue here.  The letter attached hereto as Exhibit D, prepared by the Chief Legal Counsel of the MOT, reflects the official Colombian position on this matter, as conveyed by the duly-designated Central Authority.

refusal to claim nationality renders the unflagged vessel stateless and so within federal

jurisdiction, while a supportable claim of nationality allows the federal authorities to seek

jurisdiction by consent of the flag nation, e.g., 46 U.S.C. § 70502(c)(1)(C).”); *Carvajal*, 924 F.

Supp. 2d at 249 (“A vessel is subject to United States jurisdiction if it is stateless, whether it is

located within or without a foreign nation’s territorial waters, and consent of a foreign nation is

not required as a precondition of *court* jurisdiction.”) (italics in original).

**D.**     **The GFV Antonella Seized April 12, 2010 Was a “Vessel Without Nationality”**

The GFV Antonella, interdicted by the U.S. Coast Guard on or about April 12, 2010, was

also a “vessel without nationality” under § 70502(c)(1)(A) and (d)(3), and the MDLEA’s

incorporation of customary international law.

The U.S. Coast Guard’s investigation determined that upon observance and ultimate

interdiction of the GFV, the name “Antonella” and the number “MT-03-80-670” was on the side

of the vessel, but there were no other markings, to include a homeport, on the vessel, nor was it

flying a flag.  Moreover, a search of the vessel did not reveal any registration documents.

Additionally, the captain of the vessel claimed Colombian nationality.  As a result of this claim,

and pursuant to the United States’ maritime drug trafficking bilateral agreement with Colombia,

the U.S. Coast Guard contacted the relevant Colombian authorities pursuant to the bilateral

agreement’s standard operating procedures to verify the vessel’s flag status.  In that request, the

U.S. Coast Guard mistakenly identified the vessel as the “Antonela” with registration number

“MT-0380-671.”  *See* Exhibit E at 1 (as numbered in the right-hand corner); *see also* Agreement

to Suppress Illicit Traffic By Sea, U.S.-Colom., Feb. 20, 1997, T.I.A.S. No. 12835.  The

Colombian Government, through a faxed response signed by the Director of the Center for Naval

Operations, verified by checking the "box" that the "claimed flag" "is confirmed."[12]  *See* Exhibit E at 9.  The Colombian official then authorized the boarding, inspection, and detention of the vessel, the crew, and its cargo, with a directive that if narcotics were found on board, the vessel, crew, and drug evidence would also be turned over to the Colombian Government.  *See* Exhibit E at 9-12.  After conducting its on-board investigation and following the arrival of the Colombian maritime authorities, the vessel, the drugs found on the vessel, and the crew members were, in fact, turned over to Colombian authorities for prosecution.  It appears that those individuals, while initially detained, were released pursuant to a procedural rule in Colombia which requires their presentation before a judge within 36 hours of arrest.

As above-noted, prior to indictment, the Government sought verification from the Colombian authorities whether the GFV Antonella was listed in the DIMAR's vessel registry.  In the above-referenced March 5, 2012 letter, the Colombian Government stated there was "no information about [the "Antonela"] in the General Maritime Division database."  *See* Exhibit A.  This negative result was again confirmed in the May 16, 2014 letter.  *See* Exhibit B at 1 and 3.

Moreover, although the Government's on-going investigation revealed that the GFV Antonella, with number MT-03-80-670, was also registered with Colombia's Ministry of Transportation's Transportation and Transit Division / Inland Waterways Inspection office at the written request of its represented owner, Jose Luis Guerrero Acosta, on or about March 26, 2010, approximately three weeks before the GFV Antonella's interdiction, the scope of that registration was also limited to travels within the Cartagena rivers, canals and bay.  And, as with the GFV Rilax, the GFV Antonella's Small Craft Technical Inspection Certificate stated:  "the present

---

[12]     Notably, this same form is also internally inconsistent.  For instance, on this same page in the left-hand column under 4(c) (the English side of the questionnaire), the box associated with a claimed flag status that "CAN NEUTHER [*sic*] BE CONFIRMED NOR REFUTED AT THIS TIME" is instead checked.  *See* Exhibit E at 9.

document is issued for navigating on the Magdalena River, its tributaries, Canal del Dique and

Cartagena Bay." *See* Exhibit F 1-3 (in Spanish, with English translation).

Further, as with the GFV Rilax, because the crew members of the GFV Antonella

intentionally navigated the vessel far beyond the inland waterways for which it was permitted by

the Transportation Ministry to travel, and the Colombian Government has reported negative

DIMAR checks, as well as unequivocally stated that the MOT registration had no effect outside

its inland waters, the vessel was not duly-registered by Colombia for high seas travels.  Thus,

because the Government of Colombia has not invoked that the GFV Antonella is affirmatively

and unequivocally of its nationality under the MDLEA, the vessel is properly deemed a "vessel

without nationality" under the statute and international law principles.  *See* 46 U.S.C. §

70502(d)(1)(C).  *See, e.g., United States v. Rendon*, 354 F.3d 1320 (11th Cir. 2003) (finding

vessel stateless where Colombia did not affirmatively or unequivocally confirm the master's

claim that the go-fast vessel was of Colombian nationality).

### III.   CONCLUSION

As set forth above, the Government submits that it has demonstrated by a preponderance

of evidence that this Honorable Court properly has jurisdiction under 46 U.S.C. § 70504, the

jurisdictional provision of the MDLEA.  Both of the GFVs seized in the case against the

Defendants qualify as "vessels without nationality" under § 70502(c)(1)(A) and international law

principles relating to "stateless" vessels, and are thus "vessels subject to the jurisdiction of the

United States."  This determination of jurisdiction is not only supported by the Colombian

Government's representations relating to the scope of the vessels' Transportation Ministry

registrations, but through the absence of evidence of their registrations in the DIMAR, and

Colombia's failure to affirmatively and unequivocally assert nationality over the referenced vessels.

WHEREFORE, the United States respectfully requests that the Court find pre-trial that the GFV Rilax, interdicted on or about February 22, 2010, and the GFV Antonella, interdicted on or about April 12, 2010, are "vessels without nationality" under § 70502(c)(1)(A) and (d) and under international law principles governing the nationality of vessels, and are thus "vessels subject to the jurisdiction of the United States" under the MDLEA.

Respectfully submitted this 13th day of June, 2014.

                              ARTHUR G. WYATT, Chief
                              Narcotic and Dangerous Drug Section
                              Criminal Division
                              U.S. Department of Justice

                 By:     _____/s/_____
                              Meredith A. Mills (D.C. Bar # 457843)
                              Trial Attorney
                              Narcotic and Dangerous Drug Section
                              Criminal Division / U.S. Department of Justice
                              145 N. Street, NE
                              Washington, D.C. 20530
                              Direct: (202) 305-8506
                              Fax: 202-514-0483
                              Meredith.Mills@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of June 2014, I filed the foregoing GOVERNMENT'S MOTION FOR A PRE-TRIAL DETERMINATION OF JURISDICTION BY THE COURT with the Clerk of the Court.  A copy will be served on the following:

**Counsel for Angel Javier Varon Castro**
Cynthia Katkish, Esquire
Cynthia Katkish Attorney at Law
601 Pennsylvania Avenue, NW
Suite 900-South, No. 221
Washington, DC 20004
Office: (202) 997-1386 / Fax: (202) 639-2000 / ckatkish1@comcast.net

**Counsel for Luis Delio Herrera Astudillo**
Howard B. Katzoff, Esquire
Law Office of Howard B. Katzoff
717 D. Street, N.W., Suite 310
Washington, DC 20004
Office: 202-783-6414 / Fax: 202-628-2881 / katzoffh@aol.com

**Counsel for Eusebio David Webster Archbold**
Carlos Vanegas, AFPD
Federal Public Defender for D.C.
625 Indiana Avenue, NW, Ste. 550
Washington, DC 20004-2923
Main: (202) 208-7500 / Fax: (202) 208-7515 / Carlos_Vanegas@fd.org


ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:  _____/s/_____
Meredith A. Mills (D.C. Bar # 457843)
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division / U.S. Department of Justice
145 N. Street, NE
Washington, D.C. 20530
Direct: (202) 305-8506
Fax: 202-514-0483
Meredith.Mills@usdoj.gov