**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No.: 1:12-cr-00078-4 (BAH) |
| | ) | |
| EUSEBIO WEBSTER ARCHBOLD, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT EUSEBIO WEBSTER ARCHBOLD'S MEMORANDUM IN
OPPOSITION TO THE GOVERNMENT'S MOTION FOR
A PRETRIAL DETERMINATION OF JURISDICTION BY THE COURT**

Benjamin J. Razi (D.C. Bar # 475946)
Tobias D. Tobler (D.C. Bar # 1015273)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel: (202) 662-6000
Fax: (202) 778-5463
Email: brazi@cov.com
Email: ttobler@cov.com

Carlos J. Vanegas (D.C. Bar # 447067)
FEDERAL PUBLIC DEFENDER FOR D.C.
625 Indiana Avenue, NW, Suite 550
Washington, D.C. 20004
Tel: (202) 208-7500
Fax: (202) 208-7515
Email: carlos_vanegas@fd.org

*Attorneys for Defendant Eusebio Webster
Archbold*

Date:   July 9, 2014

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 3

ARGUMENT ......................................................................................................... 7

I.      THE GOVERNMENT BEARS THE BURDEN OF ESTABLISHING
        JURISDICTION OVER THE RILAX BEYOND A REASONABLE DOUBT. ............... 7

II.     THE GOVERNMENT HAS NOT MET ITS BURDEN OF PROVING
        JURISDICTION OVER THE RILAX ............................................................. 9

        A.      The Government Has Not Proven That The Rilax Is A "Vessel Without
                Nationality" Under The Statutory Definitions Set Forth In 46 U.S.C. §
                70502(d). ........................................................................................ 10

        B.      The Government Has Not Proven That The Rilax Is "Stateless" Under
                Principles Of International Law. ....................................................... 12

CONCLUSION ......................................................................................................... 15

## INTRODUCTION

In this unusual case, the United States brings criminal charges against Defendant Eusebio Webster Archbold—a citizen of Colombia who had never been to the United States prior to his extradition—based on alleged conduct occurring 55 miles of the coast of Colombia on a boat registered with the government of Colombia. While the reach of the Maritime Drug Law Enforcement Act ("MDLEA") is broad, it is not so expansive as to encompass Mr. Archbold's alleged conduct. Because the Government has not met its burden of proving that the "Rilax" vessel is subject to the jurisdiction of the United States, this case cannot proceed against Mr. Archbold.[1]

Under established principles of international law, countries generally may not assert jurisdiction over foreign vessels on the high seas. On February 22, 2010, the U.S. Coast Guard attempted to stop and board a 30-foot motorboat named "Rilax," which was registered with the Colombian government. At the time of the attempted interdiction, the Rilax was travelling from one part of Colombia to another part of Colombia. The Coast Guard never caught the Rilax, and never interacted with her crew.

More than two years later, the U.S. Government had Mr. Archbold arrested at his home on the Colombian island of Providencia, and he was subsequently extradited to the United States. In May 2014, after Mr. Archbold had already been in the D.C. Jail for over a year, the Government admitted in a court filing to uncertainty regarding whether it has statutory authority

---

[1] The Government also briefed the issue of whether jurisdiction exists over a separate vessel, the Antonella. *See* Gov't Mot. for a Pre-Trial Determination of Jurisdiction, dated June 13, 2014, Dkt. No. 53–1 ("Gov't Mot."), at 17–20. There is no evidence linking Mr. Archbold to the Antonella. *See, e.g.*, Exhibit A, Translation of Caso Roma Investigation Report, at 212 ("***Subject[] Eusebio Webster Archbold [is] not linked to the Seventh Event***," *i.e.*, the Antonella (emphasis added)). Moreover, for reasons stated herein, the United States lacks jurisdiction over the Antonella just as it lacks jurisdiction over the Rilax. *See* Section II, *infra*.

to proceed with its charges against Mr. Archbold (and the other Defendants).   While the Government now argues that its case can go forward, evidence produced recently in fact confirms the opposite:  the Rilax was registered with the government of Colombia and is neither a "vessel without nationality" under the MDLEA, or "stateless" under international law.

The Government's strained effort to shoehorn this case within the terms of the MDLEA fails.  To establish that the Rilax is a "vessel without nationality" under the statute, the Government must prove, among other things, that the vessel's captain—while aboard the vessel—made a claim of registry to U.S. authorities.  46 U.S.C. § 70502(d)(1)(A)&(C).  Alternatively, the Government must prove that the vessel's captain—again, while aboard the vessel—refused to make such a claim when requested to do so by U.S. authorities.  *Id.* § 70502(d)(1)(B).  Here, by the Government's own admission, the Coast Guard never interacted with the Rilax's crew, and never boarded the vessel.  The MDLEA's definitions of "vessel without nationality" are therefore inapplicable.

Likewise, the Government has fallen far short of proving the Rilax is "stateless" under international law.  The only evidence the Government has submitted in support of its statelessness argument is a letter from a Colombian government attorney explaining certain Colombian legal rules regarding inland waterways vessels and maritime vessels.  The letter contains ***no opinion whatsoever*** on the nationality of vessels such as the Rilax.

Contrary to the Government's position, the evidence strongly suggests that the Rilax is Colombian.  It is undisputed that the Rilax is registered with Colombia's Transportation Ministry, and that the alleged crew members of the Rilax were all Colombian citizens.  Moreover, the *only* Colombian authority to offer an opinion on the nationality of vessels such as the Rilax—a captain in the Colombian National Ministry of Defense's Maritime Division—

2

explicitly confirmed that vessels registered with the Transportation Ministry for inland travel are "***for all effects . . . considered Colombian flagged***."

Because the Government has failed to prove jurisdiction over the Rilax, Mr. Archbold respectfully requests that the Court deny the Government's motion, and hold that the United States lacks jurisdiction to proceed with this case.[2]

## BACKGROUND

On February 22, 2010, the U.S. Coast Guard attempted to stop and board the Rilax as the vessel travelled from the northern coast of Colombia towards San Andreas Island, Colombia. Gov't Mot. for a Pre-Trial Determination of Jurisdiction, dated June 13, 2014, Dkt. No. 53–1 ("Gov't Mot."), at 2.[3]  By the Government's own admission, the Coast Guard did not board the Rilax, and did not interact with her crew.  *See id.* at 3.  The Coast Guard ultimately ceased its pursuit of the Rilax as it reentered Colombian territorial waters.  *Id.*

The Colombian Navy later found the Rilax on Santa Catalina island, a Colombian-owned island in the San Andreas Archipelago.  *Id.*  Colombian and U.S. authorities recovered cocaine from the Rilax, and cocaine allegedly jettisoned by the Rilax crew during the Coast Guard's pursuit of the vessel.  *Id.*, at 3–4.

---

[2] In addition to the jurisdictional defects outlined in this opposition brief, the Government's charges against Mr. Archbold are legally flawed for other reasons as well.  For instance, to the extent the Government purports to assert jurisdiction over Mr. Archbold on the grounds that he is a member of a conspiracy involving the Antonella, the conspiracy section of the MDLEA does not extend to conspirators whose conduct took place wholly in a foreign country, with no demonstrated nexus to the United States, on the theory that the conspiracy involved use of a stateless vessel that traveled on the high seas.  *See* 46 U.S.C. § 70506(b).  Mr. Archbold reserves the right to challenge the indictment on this basis and others if the Court permits this case to continue.

[3] Solely for the purpose opposing the Government's motion, Mr. Archbold accepts the Government's factual allegations regarding the attempted interdiction of the Rilax as true.  Even according to the Government's own version of these events, the Government lacks jurisdiction over Mr. Archbold.  *See* Section II, *infra*.

According to the Government, Mr. Archbold was on board the Rilax during the Coast Guard's attempted interdiction. *Id.* at 3–4. Mr. Archbold was subsequently arrested, and in June 2013, he was extradited to the United States. *Id.* at 6. On August 17, 2012, a federal grand jury in the District of Columbia returned a second superseding indictment charging Mr. Archbold and others with various drug offenses in violation of U.S. law. *Id.* at 1–2. He remains in U.S. custody.

Since Mr. Archbold's arrest, the Government has tried repeatedly to establish a jurisdictional basis for its case. *See* Gov't Status Report in Advance of the May 2, 2014 Status Conference, dated May 1, 2014, Dkt. No. 46 ("Gov't Status Report"), at 2 (describing "ongoing efforts to gather evidence," including receipt of "additional materials relating to the registration or nationality of the GFV Rilax"). In March 2014, a Colombian prosecutor—responding to a U.S Government request regarding jurisdiction—provided the Government with vessel registration materials from Colombia's Ministry of Transportation ("MOT"). *Id.* at 2. These documents included "various forms relating to [the Rilax's] registration in Colombia," *id.*, including a license and permits issued for the Rilax by the MOT:



Gov't Mot., Exhibit C; *see also* Gov't Mot., at 14–15 ("the Government's on-going investigation revealed that the GFV Rilax, with number MT-03-80-653, was registered with [the MOT]").

Upon learning that the Rilax was registered with the MOT, the Government informed the Court in May that it was "unclear what, if any, impact [this] registration[] [had] on the analysis of whether [the Rilax was] deemed Colombian-flagged for purposes of travel in international waters and/or for purposes of determining jurisdiction under the MDLEA." Gov't Status Report, at 3.

The U.S. Government continued its search for evidence that might support its effort to assert jurisdiction over the Rilax. On May 7, 2014, at the U.S. Government's request, Colombian law enforcement sent information requests to Colombia's National Defense Ministry, Maritime Headquarters ("DIMAR") and MOT's River Inspection Office posing the following question:

> Once a motorboat is registered with the Ministry of Transport, does it become automatically registered with the Ministry of Defense DIMAR? And will it be considered registered in Colombia when conducting a search through DIMAR, or for any other maritime purpose, including [to ascertain] whether the boat bears the Colombian flag, pursuant to the Colombia-USA Agreement to Suppress Illicit Traffic by Sea, signed between the two countries on February, 20, 1997?

Exhibit B, Investigative Report of Colombian Judicial Police, dated May 19, 2014, at 1–2.

On May 8, 2014, Ariel Manuel Arteta Rúa, a River Inspections Officer, responded on behalf of the MOT. He explained that the MOT and DIMAR databases were independent of each other, but took no position on whether a motorboat registered with the MOT "bears the Colombian flag," under Colombian or international law. Exhibit C, Letter from A. Rúa to the General Prosecutor's Office, dated May 8, 2014.

On May 16, 2014, Captain Julio Cesar Poveda Ortega, Port of Cartagena Harbormaster, responded on behalf of DIMAR. In a letter to the Colombian Attorney General—which the

Government did not submit with its motion papers—Captain Ortega explained that a motorboat registered with MOT, like a motorboat registered with DIMAR, is "***for all effects . . . considered Colombian flagged***," including "international agreements."  Exhibit D, Letter from Capt. Ortega to the Office of the Attorney General of Colombia, dated May 16, 2014 (emphasis added).  In a separate letter to Colombian prosecutors, Captain Ortega again stated that motorboats registered with the MOT "are vessels . . . ***deemed to bear the Colombian flag, for all purposes***."  Exhibit E, Letter from Capt. Ortega to the General Prosecutor's Office, dated May 16, 2014 (emphasis added).

Apparently unsatisfied with this definitive response, the Government reached out yet again to Colombian authorities to obtain a second opinion on the nationality of the Rilax. According to the Government, "the United States requested that the [MOT] formally convey the Colombian Government's position on this matter."  Gov't Mot., at 15.

On June 12, 2014, Gina Astrid Salazar Landinez, MOT Office of Legal Counsel, responded on behalf of the MOT.  Her letter explained that the MOT has legal responsibility for registering inland vessels whereas DIMAR registers maritime vessels.  Gov't Mot., Exhibit D, at 3.  Unlike Captain Ortega, who explained that vessels such as the Rilax are Colombian flagged "for all purposes," Ms. Landinez provided no opinion on the nationality of vessels registered with the MOT generally, nor an opinion on the nationality of the Rilax specifically.  *Id.*  The following day, the Government filed its motion with this Court, arguing that the Rilax is a vessel lacking nationality and therefore subject to U.S. jurisdiction under the MDLEA.

## ARGUMENT

### I. THE GOVERNMENT BEARS THE BURDEN OF ESTABLISHING JURISDICTION OVER THE RILAX BEYOND A REASONABLE DOUBT.

The MDLEA prohibits any person from manufacturing, distributing, or possessing with an intent to distribute, a controlled substance, if that person is aboard (i) a vessel of the United States, (ii) a vessel subject to the jurisdiction of the United States, or (iii) any vessel if he is a U.S. citizen or resident alien.  46 U.S.C. § 70503(a).  The Government bears the burden of establishing jurisdiction under the MDLEA.  *United States v. Tinoco*, 304 F.3d 1088, 1114 (11th Cir. 2002).

In its brief, the Government argues that it need only meet the lower "preponderance of the evidence" standard applicable in civil lawsuits.  *See* Gov't Mot., at 12–13.  But established interpretive rules and the nature of the jurisdictional inquiry require that jurisdiction be proven "beyond a reasonable doubt."

Prior to the statute's amendment in 1996, courts widely agreed that the MDLEA required proof of jurisdiction "beyond a reasonable doubt."  *See, e.g.*, *United States v. Guerrero*, 114 F.3d 332, 339 (1st Cir. 1997); *United States v. Behety*, 32 F.3d 503, 509 n.8 (11th Cir. 1994).  In 1996, Congress amended the MDLEA to clarify that "[a]ll jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge."  Pub. L. No. 104-324, § 1138(a)(5), 110 Stat. 3901 (1996); 46 U.S.C. § 70504(a).  While this provision removed jurisdiction from consideration by the jury, Congress did not make any amendment regarding the standard of proof.[4]

---

[4] Standard of proof is not invariably linked to the allocation of decision-making authority. For instance, judges may employ the "beyond a reasonable doubt" standard when determining guilt for petty offenses and juvenile delinquency charges, just as juries may resolve venue issues (continued…)

"The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midlantic Nat'l Bank v. New Jersey Dep't of Envt'l Protection*, 474 U.S. 494, 501 (1986); *see also United States v. O'Brien*, 560 U.S. 218, 231 (2010) ("Congress does not enact substantive changes *sub silentio*."). Because the 1996 amendment evinces no intent on Congress's part to disturb the pre-existing "beyond a reasonable doubt" standard, this Court should not construe the statute to include such a revision.

Furthermore, the case-dispositive nature of the MDLEA's jurisdictional inquiry counsels in favor of a higher standard of proof. Courts agree that, in the typical context, the Government must establish jurisdiction over a defendant "beyond a reasonable doubt." 4 Wayne R. LaFave et al, Criminal Procedure § 16.4(d) (3d ed. 2013) (collecting cases). This view reflects an understanding that jurisdictional questions are qualitatively different from the types of procedural issues typically decided by a preponderance. For instance, venue can be decided by a preponderance because the consequences of trying a case in the wrong place are far less serious than the consequences of an "erroneous jurisdictional determination," which allows a state to impose punishment where it lacks authority to do so. *See id.*

The MDLEA restricts the scope of the United States' authority to enforce the statute against maritime vessels. *See United States v. González*, 311 F.3d 440, 443 (1st Cir. 2002) ("'[J]urisdiction' means something akin to 'authority over.' Here, the word evidently refers to the substantive reach of the statute—applying to some vessels but not others." (internal citation and emphasis omitted)). Specifically, it formalizes international-law limitations on the United

---

by a preponderance of the evidence. *See, e.g.*, *United States v. McFarland*, 445 F.3d 29, 30–31 (1st Cir. 2006); *United States v. Perez*, 280 F.3d 318, 330 (3d Cir. 2002).

States' authority over ships and persons that are subject to the authority of another sovereign. *See Tinoco*, 304 F.3d at 1108 (jurisdictional requirement was included in MDLEA to "protect the interest of the flag nation and international comity" (internal alterations omitted)).  Thus, as in other jurisdictional contexts, analyses of jurisdiction under the MDLEA allocate among sovereigns the power to impose punishment; they do not merely resolve evidentiary or routine procedural issues.  Accordingly, the Government should be required to prove MDLEA jurisdiction "beyond a reasonable doubt."[5]

## II.   THE GOVERNMENT HAS NOT MET ITS BURDEN OF PROVING JURISDICTION OVER THE RILAX.

To meet its jurisdictional burden, the Government must demonstrate that the Rilax was a "vessel subject to the jurisdiction of the United States."  46 U.S.C. § 70502(c).  The sole basis for the Government's claim of jurisdiction over the Rilax is that she constitutes a "vessel without nationality" under 46 U.S.C. § 70502(c)(1)(A).  *See* Gov't Mot., at 13.  The Government can prove a vessel lacks nationality in either of two ways: (1) it can establish that the vessel falls within one of the three definitions at 46 U.S.C. § 70502(d); or (2) it can prove the vessel is "stateless" under international law.  *United States v. Rosero*, 42 F.3d 166, 171 (3d Cir. 1994).

Here, the Government has failed to prove—beyond a reasonable doubt *or* by a preponderance—

---

[5] In *United States v. Carvajal*, another court in this district applied the "preponderance of the evidence" standard to the jurisdiction determination after the parties did not brief the issue. 924 F. Supp. 2d 219, 230 (D.D.C. 2013).  The *Carvajal* Court provided no reasoning in support of this holding, but merely noted that an out-of-circuit court had previously applied the preponderance standard in this context.  *Id.*  Mr. Archbold respectfully submits that *Carvajal* does not constitute persuasive authority on this issue.  *See In re Exec. Office of President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district." (internal citation and quotation marks omitted)).

that the Rilax is a "vessel without nationality" under the MDLEA or "stateless" under international law.

      **A.**      **The Government Has Not Proven That The Rilax Is A "Vessel Without Nationality" Under The Statutory Definitions Set Forth In 46 U.S.C. § 70502(d).**

The MDLEA defines "vessel without nationality" to include three categories of vessels: (1) "a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed"; (2) "a vessel aboard which the master or individual in charge fails, on request of an officer of the United States . . . to make a claim of nationality or registry for that vessel"; and (3) "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality."  46 U.S.C. § 70502(d).

The MDLEA also identifies the three ways in which a vessel can make "a claim of nationality or registry":  (1) by "possess[ing] on board the vessel and produc[ing] . . . documents evidencing the vessel's nationality"; (2) by "flying its nation's ensign or flag"; or (3) through "a verbal claim of nationality or registry by the master or individual in charge of the vessel."  46 U.S.C. § 70502(e).

Critically, under the first and third prongs of the MDLEA's definition of "vessel without nationality," a vessel is stateless, and subject to U.S. jurisdiction, "only if a claim of nationality or registry is made."  *United States v. Maynard*, 888 F.2d 918, 923 (1st Cir. 1989); *see also id.* at 924 ("If . . . no claim of nationality was made, then the government cannot claim that the [vessel] was a stateless vessel under the statute's first prong, i.e., that a vessel is stateless *if* the master makes a claim of nationality which is denied by the flag nation.").  The second prong of section 70502(d) applies only if the master of the vessel fails, on request of U.S. authorities, to make a

claim of nationality or registry for the vessel. *See, e.g.*, *id.* at 925 ("[I]f a nationality claim was not made or denied . . . and no subsequent request was made and denied prior to boarding, under the statute the vessel was not stateless prior to boarding."); *United States v. Acosta Valdez*, 84 F. Supp. 2d 237, 238 (D.P.R. 1999) (statutory definitions of "vessel without nationality" inapplicable where the master of the vessel made no claim of nationality at the time of the vessel's boarding by Customs officers, and the officers made no request of nationality).

The Rilax plainly does not fall within any of the three categories defined in section 70502(d). According to the Government's own recitation of the facts, no Rilax crewmember made a claim of nationality or registry on board the vessel. And no Rilax crewmember refused to make such a claim on request of U.S. authorities. Indeed, the Rilax crew never interacted with the U.S. Coast Guard, on board the Rilax or otherwise. *See* Gov't Mot., at 13 ("none of the crew members made a claim that the vessel was registered to or flagged with a particular country, identified the vessel's owner, or presented any form of paperwork documenting ownership or registration with the Colombian government").[6] The MDLEA's statutory definition of a "vessel without nationality" is therefore facially inapplicable to the Rilax.

The Government appears to argue, citing section 70502(d)'s third prong, that the Rilax is a "vessel without nationality" because the Colombian government has *not* "affirmatively and unequivocally" asserted that the Rilax is Colombian. Gov't Mot., at 15–16. This argument fails. As explained above, section 70502(d)'s third prong has no application where, as here, the vessel

---

[6] These facts distinguish the present case from *United States v. Carvajal*, cited by the Government. In *Carvajal*, U.S. authorities questioned the crew members aboard the vessels at issue, and "none of [them] indicated that the vessel was registered to particular country, identified the vessel's owner, or provided paperwork documenting ownership or registration with the Colombian government." 924 F. Supp. 2d at 236. "Moreover," as the *Carvajal* Court noted, "because neither boat was registered, had a 'claim of nationality or registry' been made, it inevitably would have been rejected." *Id.*

has made no claim of registry.  And even assuming this prong did apply, the *only* Colombian authority to offer an opinion on the nationality of vessels such as the Rilax—Captain Ortega of DIMAR—has explicitly and affirmatively stated that these vessels are Colombian.  *See* Exhibit D (letter from DIMAR explicitly confirming that vessels registered with MOT for inland travel are *"for all effects . . . considered Colombian flagged"* (emphasis added)); Exhibit E (letter from DIMAR stating that such vessels are *"deemed to bear the Colombian flag, for all purposes"* (emphasis added)).  The June 12, 2014 letter from MOT's legal counsel—which offers no opinion whatsoever on the nationality of vessels like the Rilax—is not to the contrary.  *See* Section II.B, *infra*.[7]

### B. The Government Has Not Proven That The Rilax Is "Stateless" Under Principles Of International Law.

Because the Rilax does not fall within any of the categories defined in section 70502(d), the Government can only establish jurisdiction if it proves that the Rilax was "stateless" under international law.  *See Rosero*, 42 F.3d at 171.  Here, the Government has provided no evidence to support any such conclusion.

Under international law, a "stateless" vessel is one lacking a valid grant of nationality from any country.  *See id.* ("the core concept of a vessel that is 'without nationality' or stateless is that the vessel lacks authorization to fly the flag of any recognized state").  According to established maritime principles, each country "may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and

---

[7] The Antonella, like the Rilax, is registered with the MOT.  Gov't Mot., Exhibit F.  The captain of the Antonella allegedly claimed Colombian nationality for his vessel when the Coast Guard interdicted it.  *See* Gov't Mot., at 17.  But the third prong of section 70502(d) is nevertheless inapplicable to the Antonella because, as noted above, the *only* Colombian authority to offer an opinion on the nationality of vessels registered with the MOT has affirmatively stated that these vessels are Colombian flagged.  *See* Exhibits D, E.  So, the Government's claim to statutory jurisdiction over the Antonella also fails.

acquiring authority over it." *Lauritzen v. Larsen*, 345 U.S. 571, 584 (1953); *see also* Purchase of

Ships of Belligerents by Neutrals, 6 Op. Att'y Gen. 638, 640 (1854) ("The law of nations and

common sense combine to require that every ship shall have a nationality, defined and evidenced

in each case according to the municipal law of the particular nation to which the ship

appertains."); United Nations Convention on the Law of the Sea, art. 91, Dec. 10, 1982, 1833

U.N.T.S. 561 ("Every State shall fix the conditions for the grant of its nationality to ships, for the

registration of ships in its territory, and for the right to fly its flag.").

     National laws prescribing the conditions of vessel nationality vary from country to

country.  In some countries, mere ownership by a national is sufficient to establish the nationality

of the ship.  H. Meyers, The Nationality of Ships 147 (1967); *see also The Chiquita*, 19 F.2d 417,

418 (5th Cir.1927) ("If [a vessel] is not properly registered, her nationality is still that of her

owner.").  In others, the state may confer nationality on a vessel through "an explicit act of the

administration."  Meyers, *supra*, at 147.  And while some nations link nationality to registration

of the vessel, *see id.*, others do not, *see, e.g.*, *The Chiquita*, 19 F.2d at 418; N.P. Ready, Ship

Registration 3 (3d ed. 1998) ("A vessel may be considered as possessing the nationality of a

State even though she is unregistered, possesses no documents evidencing that nationality, nor

even flies the flag of that State."); Ted L. McDorman, S*tateless Fishing Vessels, International

Law and the U.N. High Seas Fisheries Conference*, 25 J. Mar. L. & Comm. 531, 533 (1994)

("Determining vessel nationality. . . is not just a question of documentation of the vessel[,] and a

vessel literally without a flag, not being a vessel registered in a country, is not necessarily

stateless or without nationality.").

     Here, the Government has fallen far short of proving that the Rilax is "stateless."  It has

offered absolutely no explanation or expert opinion on *why* or *how* the Rilax lacks nationality

under Colombian and/or international law.  Instead, the Government rests its argument for

statelessness on the claim that MOT's legal counsel "definitively" stated in a June 12, 2014 letter

that the Rilax's territorial and use limitations "were not intended to convey Colombian

nationality . . . in maritime waters."  Gov't Mot., at 16.

Notwithstanding the characterizations in the Government's brief, the June 12 letter from

the MOT contains *no* representations *whatsoever* regarding the nationality of vessels.  Rather,

the letter simply relates that Colombia maintains independent vessel registration systems for

inland waterway vessels and maritime vessels.  Gov't Mot., Exhibit D.  It further explains that

use of an inland vessel for maritime navigation violates the Colombian Code of Commerce.  *Id.*

Nowhere does the June 12 letter make reference to the nationality of ships *generally*, let

alone the nationality of the Rilax specifically.  Nevertheless, the Government extrapolates—

*relying upon no authority*—that where a Colombian vessel registered for the navigation of inland

waterways travels on the high seas, it lacks nationality under international law.  *See* Gov't Mot.,

at 16.  Such speculation regarding the contours of Colombian and international maritime law is

not competent evidence; it certainly cannot serve as the basis for asserting U.S. criminal

jurisdiction over a Colombian vessel and its Colombian crew.

Mr. Archbold, in contrast to the Government, has no obligation to prove the Rilax's

nationality.  But it bears emphasizing that the evidence overwhelmingly indicates the Rilax is a

vessel of Colombian nationality.  The Rilax is validly registered with Colombian authorities, for

instance, *see* Gov't Mot., Exhibit C—a factor to which courts and commentators analyzing

nationality have attributed significance.  *See, e.g.*, *United States v. Matute*, 767 F.2d 1511, 1512

(11th Cir. 1985) ("There is no question that the BISMARK was not 'a vessel without nationality'

because it is undisputed that the BISMARK was validly registered in Venezuela."); Restatement

(Third) of Foreign Relations Law § 501 (1987) ("A ship has the nationality of the state that registered it and authorized it to fly the state's flag."); *cf. Marino-Garcia*, 679 F.2d at 1382 ("[F]lagless vessels are frequently not subject to the laws of a flag-state.").  The Rilax's crew were also Colombian nationals, which constitutes further evidence of the vessel's Colombian nationality.  *See United States v. Piedrahita-Santiago*, 931 F.3d 127, 130 (1st Cir. 1991) (citing nationality of crewmembers as evidence of vessel's nationality).

Most significantly, the National Ministry of Defense's Maritime Division explicitly confirmed that vessels registered with the MOT for inland travel are "***for all effects . . . considered Colombian flagged***."  Exhibit D (emphasis added); *see also* Exhibit E (letter from DIMAR stating that such vessels are "***deemed to bear the Colombian flag, for all purposes***" (emphasis added)).  Thus, the *only* Colombian authority to offer an opinion on the nationality of vessels like the Rilax has unequivocally stated that such vessels are Colombian.  In short, not only is the Government's proof of "statelessness" insufficient to bear its burden, but the evidence in fact supports the opposite conclusion.[8]

## CONCLUSION

For the foregoing reasons, Mr. Archbold respectfully requests that the Court deny the Government's Motion for a Pre-Trial Determination of Jurisdiction, and hold that the United States lacks jurisdiction to proceed with this case.

---

[8] As with the Rilax, the Government has provided no evidence that the Antonella is "stateless" under international law.  On the contrary, the evidence indicates that the Antonella— another motorboat registered with MOT—is a Colombian vessel.  *See* Gov't Mot., Exhibit F. The analysis in Section II.B, *supra*, therefore applies to the Antonella as well as the Rilax.

Dated:  July 9, 2014

Respectfully submitted,


/s/ Benjamin J. Razi_____
Benjamin J. Razi (D.C. Bar # 475946)
Tobias D. Tobler (D.C. Bar # 1015273)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel: (202) 662-6000
Fax: (202) 778-5463
Email: brazi@cov.com
Email: ttobler@cov.com


Carlos J. Vanegas  (D.C. Bar # 447067)
FEDERAL PUBLIC DEFENDER FOR D.C.
625 Indiana Avenue, NW, Suite 550
Washington, D.C. 20004
Tel: (202) 208-7500
Fax: (202) 208-7515
Email: carlos_vanegas@fd.org

*Attorneys for Defendant Eusebio Webster Archbold*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 9, 2014, I caused a copy of the foregoing opposition brief and the attached exhibits to be filed via the Court's CM/ECF filing system, which will cause a copy of these documents to be served on counsel for all parties that have entered an appearance in this action.

/s/ Benjamin J. Razi_____
Benjamin J. Razi